FILED

2007 Mar-29  AM 10:45
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ALABAMA SOUTHERN DIVISION

| | | |
|---|---|---|
| CAROLYN MARBURY, | ) | |
| PLAINTIFF, | ) | |
| VS. | ) | 2:06-cv-0061-JHH |
| BIRMINGHAM AIRPORT AUTHORITY, | ) | |
| DEFENDANT. | ) | |

## MEMORANDUM OPINION

The court has before it the January 2, 2007 motion (doc. #17) of defendant Birmingham Airport Authority ("BAA") for summary judgment and the brief (doc. #21) in support thereof.  The court also has before it the BAA's February 5, 2007 motion (doc. #28) to strike portions of plaintiff's affidavit, which affidavit was submitted in response to defendant's motion for summary judgment.

Having considered the briefs and evidentiary submissions, the court finds that both defendant's motion (doc. #17) for summary judgment and defendant's motion (doc. #28) to strike are due to be granted in their entirety for the reasons outlined below.

## I.    INTRODUCTION

Plaintiff Carolyn Marbury ("Marbury") initiated this lawsuit (doc. #1) on January 10, 2006 by filing a complaint in this court.  The complaint asserts claims (not in separately numbered counts) as relevant here:[1] under Title VII for gender related hostile work environment, gender related disparate terms and conditions of employment, and gender related retaliation and under state law for invasion of privacy and outrage. (See Compl. ¶¶ 5, 8.)

Defendant BAA's January 2, 2007 motion (doc. #17) for summary judgment asserts that no genuine issue of material fact exists and that the BAA is entitled to judgment as a matter of law as to all claims asserted against it.  The parties have each filed briefs and submitted evidence in support of their respective positions concerning the pending motion for summary judgment.  On January 11, 2007 defendant BAA submitted evidence[2] (doc. #19) in support of the motion (doc. #17), and also submitted a supporting brief (doc. # 21).  Plaintiff submitted  a brief (doc. #23) in

---

[1] The Complaint also asserted various claims against Mary Mindingall and the City of Birmingham as party defendants.  Plaintiff filed a motion (doc. #8) to dismiss without prejudice all claims against the City of Birmingham which was granted by court order (doc. #9) dated January 20, 2006.  Plaintiff also filed a motion (doc. #12) to dismiss, without prejudice, the party defendant Mary Mindingall and all 42 U.S.C. § 1983 claims asserted in the Complaint.  That motion (doc. #12) was granted by court order (doc. #15) dated February 21, 2006.

[2] Defendant BAA submitted: the sworn deposition of plaintiff, Carolyn Marbury, with exhibits; the sworn deposition of Leslie Murray, with exhibits; excerpts from the sworn deposition testimony of Fred Anderton; and the sworn declaration of Leslie Murray, with exhibits.

opposition to defendant's motion for summary judgment and evidence in support thereof[3] on January 25, 2007.

On February 5, 2007, defendant filed a reply brief (doc. #27) to plaintiff's opposition, along with a motion (doc. #28) to strike portions of plaintiff's affidavit, which affidavit was part of plaintiff's evidentiary submission.  On February 13, 2007 plaintiff responded in opposition (doc. #32) to defendant's motion to strike.

Both the motion (doc. #17) for summary judgment and the motion (doc. #28) to strike are considered herein.

## II.    SUMMARY JUDGMENT STANDARD

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact

---

[3] Plaintiff Carolyn Marbury submitted: 3/4/05 memo to Leslie Murray; 10/12/05 letter to Leslie Murray; 3/1/05 memo to Leslie Murray; 6/7/05 memo to Leslie Murray; 10/14/05 memo to Cheryl Edwards; excerpt from Leslie Murray interview regarding the 1st complaint of harassment by Ms. Marbury with Mr. Dennis; excerpt from Leslie Murray interview with Mr. Dennis regarding the 1st complaint of harassment by Ms. Marbury; excerpt from Leslie Murray interview regarding the 1st complaint of harassment by Ms. Marbury with Ms. Marbury; excerpt from Leslie Murray interview regarding the 1st complaint of harassment by Ms. Marbury with Leslie Murray; excerpt from Leslie Murray interview regarding 1st complaint of harassment by Ms. Marbury with Leslie Murray; excerpt from Leslie Murray interview regarding the 1st complaint of harassment by Ms. Marbury with Ms. Marbury; excerpt from Leslie Murray interview regarding the 1st complaint of harassment by Ms. Marbury with Ms. Marbury; excerpt from Leslie Murray interview regarding the 1st complaint of harassment by Ms. Marbury with Ms. Marbury; memo date September 28, 2005 to Marbury from Mindingall, Evaluation Appeal; memo May 18, 2006, to Marbury from Murray, Salary Adjustment; 12/28/05 letter to Mindingall from Marbury, disagreement with evaluation and further complaint of harassment and retaliation; Birmingham Airport Authority Personnel Action Form 6/3/05 – Marbury pay raise; memo, 2/2/06 to Mindingall from Marbury, Performance Evaluation and further complaint of abuse and harassment and retaliation; affidavit of Ms. Marbury; and plaintiff interrogatory answer #7.

and that the moving party is entitled to judgment as a matter of law." <u>Celotex Corp.</u> <u>v. Catrett</u>, 477 U.S. 317, 322 (1986); <u>see</u> <u>also</u> <u>Chapman v. AI Transport</u>, 229 F.3d 1012, 1023 (11th Cir. 2000).  The party asking for summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings or filings that the moving party believes demonstrate the absence of a genuine issue of material fact.  <u>See</u> <u>Celotex Corp.</u>, 477 U.S. at 323.  Once the moving party has met its burden, Rule 56(e) requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial.  <u>See</u> <u>id.</u> at 324.

The substantive law will identify which facts are material and which are irrelevant. <u>See</u> <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986); <u>see</u> <u>also</u> <u>Chapman</u>, 229 F.3d at 1023.  All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the nonmovant.  <u>See</u> <u>Chapman</u>, 229 F.3d at 1023; <u>See</u> <u>also</u> <u>Fitzpatrick v. City of Atlanta</u>, 2 F.3d 1112, 1115 (11th Cir. 1993).  A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." <u>Anderson</u>, 477 U.S. at 248; <u>see</u> <u>also</u> <u>Chapman</u>, 229 F.3d at 1023. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted.  <u>See</u> <u>Anderson</u>, 477 U.S. at 249-50.  The method used by

4

the party moving for summary judgment to discharge its initial burden depends on whether that party bears the burden of proof on the issue at trial.  See Fitzpatrick, 2 F.3d at 1115-17, citing United States v. Four Parcels of Real Property, 941 F.2d 1428 (11th Cir. 1991) (en banc).  If the moving party bears the burden of proof at trial, then it can only meet its initial burden on summary judgment by coming forward with positive evidence demonstrating the absence of a genuine issue of material fact (i.e. facts that would entitle it to a directed verdict if not controverted at trial).  See Fitzpatrick, 2 F.3d at 1115.  Once the moving party makes such a showing, the burden shifts to the nonmoving party to produce significant, probative evidence demonstrating a genuine issue for trial.

If the moving party does not bear the burden of proof at trial, it can satisfy its initial burden on summary judgment in either of two ways.  First, the moving party may produce affirmative evidence negating a material fact, thus demonstrating that the nonmoving party will be unable to prove its case at trial.  Once the moving party satisfies its burden using this method, the nonmoving party must respond with positive evidence sufficient to resist a motion for directed verdict at trial.  The second method by which the moving party who does not bear the burden of proof at trial can satisfy its initial burden on summary judgment is to affirmatively show the absence of evidence in the record to support a judgment for the nonmoving party on the issue

in question.  This method requires more than a simple statement that the nonmoving party cannot meet its burden at trial but does not require evidence negating the nonmovant's claim; it simply requires the movant to point out to the district court that there is an absence of evidence to support the nonmoving party's case.  See Fitzpatrick, 2 F.3d at 1115-16.  If the movant meets its initial burden by using this second method, the nonmoving party may either point out to the court record evidence, overlooked or ignored by the movant, sufficient to withstand a directed verdict, or the nonmoving party may come forward with additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency.  However, when responding, the nonmovant can no longer rest on mere allegations, but must set forth evidence of specific facts.  See Lewis v. Casey, 518 U.S. 343, 358 (1996), citing Lujan v. Defenders of Wildlife, 504 U.S. 555, 561 (1992)).

## III.   RELEVANT UNDISPUTED FACTS[4]

### A.   Marbury's Employment with the BAA

Marbury was hired by the BAA in 1998 as a custodial supervisor and remains in that capacity today.  (See Pl. Dep. at 52, 81; see also Doc. #23, pp. 3-4, ¶ 1.)  She

---

[4] If the facts are in dispute, they are stated in the manner most favorable to the nonmoving party.  See Fitzpatrick, 2 F.3d at 1115.

is responsible for maintaining the appearance and cleanliness of the airport by organizing, coordinating, and anticipating cleaning and staffing needs. (See Murray Decl. at ¶ 2.)  She is also responsible for training subordinates in the performance of their duties (see id.); she currently supervises approximately twenty-nine employees, as well as two lead employees (see Pl. Dep. at 65 and Doc. #23, pp. 3-4, ¶ 1).  As of Spring/Summer 2003, Marbury reported to Julius Dennis, Facility Manager.[5]  (See Murray Decl. at ¶ 3.)  Dennis, in turn, reported to Fred Anderton, Director of Operations.  (See Pl. Dep. at 119.)

Upon her hire, plaintiff received the BAA's policies and procedures manual. (See Pl. Dep. at 58-59.)  She continued to receive updates of that manual from time to time during her employment and has, at all relevant times, been aware that any complaints of harassment and/or discrimination should be immediately reported to human resources or Mary Mindingall, Director of Properties and Administration. (See id. at 65.)  In fact, Marbury was required to attend, and did attend, management training on the anti-harassment, diversity, and non-discrimination policies on several occasions throughout 2003, 2004, and 2005.[6]  (See id. at 59-64; see also Murray Decl. at ¶ 4.)

---

[5] From the date of his hire, Dennis was the supervisor over the Maintenance Supervisor (James Curtis) and Marbury.  (See Doc. #23, p.4, first ¶ 2.)

[6] Facility Manager Julius Dennis, plaintiff's supervisor, was also required to attend, and did attend, these training sessions.  (See Pl. Dep. at 63-64; see also Murray Decl. at ¶ 4.)

### B.      The Working Relationship between Marbury and Dennis

In March 2004, three employees complained to Al Denson, the BAA Executive Director, that Marbury was acting unreasonably toward them and was ignoring them. (See Pl. Dep. at 171; see also Def.'s Exh. 15 to Pl. Dep.)  Then, in April 2004, the BAA received an Equal Employment Opportunity Commission ("EEOC") charge filed by plaintiff's subordinate James Coleman, alleging retaliation by Marbury in violation of Title VII.  (See Murray Decl. ¶ 5.)  Dennis met with Marbury regarding these complaints.  He told her that the main complaint of her subordinates was that she did not speak to them.  (See Pl. Dep. at 173, 176.)  Dennis explained to plaintiff that he was concerned about the situation.  (See id.)

Subsequently, Marbury started to experience increased scrutiny from Dennis which she characterizes as a "campaign of harassment in which his managerial style toward [herself], and women in general, was extremely hostile, very aggressive, and demeaning."[7]  (See id. at 174; see also Compl. at ¶ 5 and Doc. #23, p. 4, first and second ¶¶ 1.)  The pair butted heads on decisions of employee leave and employee shifts (see Def.'s Exhs. 17, 38 to Pl. Dep.) and struggled on issues of their respective authority for decision-making (see Def.'s Exhs. 16, 18 to Pl. Dep.).  Although the

_____

[7] Although the increased scrutiny chronologically followed the complaints lodged against Marbury, the issue of whether the scrutiny stemmed from those complaints or discrimination is the crux of this lawsuit.  (See Doc. #23, p.2, ¶ 3.)

8

BAA believed that the issues between the two were the result of a break down in communication, plaintiff believes that the issues surrounding the deteriorating working relationship stem from harassment and retaliation.  (See Def.'s Exhs. 20-23, 26-28 to Pl. Dep.)

### 1.    Plaintiff's Complaints of Harassment

Plaintiff points to several incidents of alleged harassment.  Dennis informed her that she was not to speak to anyone (see Pl. Dep. at 177-85; see also Doc. #23, p.4, second ¶ 2);[8] he yelled and screamed at her constantly, at times pounding on the

---

[8] On this point, plaintiff testified:

> Q:    What was your understanding of what he was trying to tell you when he said not to talk to anyone?
> A:    I couldn't understand what he meant.  I was just not to talk to anyone.  I was just not to do that.
>
> Q:    Okay.  Well, obviously you're still – you continued to communicate with employees, you continued to communicate with your husband, you continued to use your voice, correct?
> A:    Communication with employees was totally different.
>
> Q:    Right now what I'm trying to get at is how did you interpret that remark?
> A:    Just, I interpreted it just like he said it, just don't talk to anybody.
>
> Q:    Well, you didn't walk around a mute for the next several months?
> A:    I did very little talking, very little.  And I already don't talk a lot anyway, so I – it just, I didn't do much talking at all.
>
> Q:    So, you were unclear as to what he was asking you when he said don't talk to anyone?
> A:    He made his self very clear.  He did not want me talking to anyone.  He made his self clear about that.
>
> . . .
>
> Q:    Did you ever ask him what do you mean?

desk (see Doc. #23, p.5, ¶¶ 4, 6); he required her repeat orders three or four times[9] (see Pl. Dep. at 178, 185-86; see also Doc. #23 at 5, ¶¶ 5-6); he told her employees that they could bypass her if they had concerns about her and asked employees outside of her department (i.e. Curtis James) to keep an eye on her crew (see Doc. #23 at 5, ¶¶ 8-9); and he made derogatory comments – he asked her to cook for him, yelled and screamed at her to "get, get," and told her that "men were over everything" (Pl. Dep. at 191-92, 208-09; see also Doc. #23, p.4, second ¶ 1 and ¶ 3).

Marbury further alleges that the "harassing" behavior became physical on two occasions in November 2004.  Dennis allegedly approached Marbury when she was

---

| A: | No. |
| --- | --- |
| Q: | So, you weren't sure what he meant, but you just didn't bother to say, well, what do you mean by that? |
| A: | He constantly told me not to speak freely to people, not to speak openly to people. |
| Q: | About other people? |
| A: | About any issues.  About – |
| Q: | To be discrete? |
| A: | I'm already a discrete – it wasn't that I wasn't discrete. |
| . . . | |
| Q: | Well, about departmental issues, correct? |
| A: | He never said that it was about department issues.  He just said the words. |

(Pl. Dep. at 177-85.)

[9] Plaintiff admits that Dennis may have told her that he was asking her to repeat orders due to communication problems they were having.  (See Pl. Dep. at 187-88.)  Dennis admitted to Leslie Murray, Human Resources, that he had to exert or show more authority over Marbury.  (See Doc. #22, Exh. F.)

seated, got within eighteen inches of her, shook a radio at her, and "pushed his body, his hips and his body, stomach pushed it up against my – I was looking at him, wondering what he was doing, and he just came, stood up there, and just pushed his self up against – right here where I'm sitting" to the point where his zipper was almost in her face, by virtue of the fact that she was sitting and he was standing. (Pl. Dep. at 195, 204-05.) Thereafter, Dennis allegedly began screaming and hollering at Marbury that she was always misunderstanding him. (See id. at 200-01.)

Marbury first complained that she felt she was being harassed in November 2004, by way of a concluding line in an e-mail addressed to Dennis. "One last thing I expect you to stop harassing me." (Def.'s Exh. 19 to Pl. Dep.; see also Doc. #23, p. 3, ¶ 6.) Leslie Murray, Human Resources, became aware of the comment and immediately sent a memo to Marbury, requesting that she "make a formal complaint addressing the issue of harassment from your supervisor Julius Dennis and submit it to my office no later than Friday, December 3, 2004." (Def.'s Exh. 20 to Pl. Dep.) In response thereto, plaintiff made her first official written complaint regarding "harassment by manager." (See Exh. 21 to Pl. Dep.; see also Doc. #28, p. 6, ¶ 15.) Within the memo, plaintiff stated her concern that Dennis was using his position as a Facility Manager as an excuse to intimidate and control her. (See Def.'s Exh. 21 to Pl. Dep.) She noted that she felt uncomfortable working with Dennis and as a

11

result "endured an extreme amount of unnecessary stress."[10]   (Id.)

Murray investigated plaintiff's complaint.[11]   During the course of the investigation, Marbury explained that she was not alleging physical or sexual harassment, but rather verbal harassment – Dennis intimidated her by coming into her office and putting his hands on his hips, and making comments like "You get back in here and sit down, I am not finished with you," and making her feel uncomfortable by bringing up a rumor that she was having an affair.  (See Doc. #22, Pl.'s Exhs. 8-11.) Murray summarized her conclusions from the investigation by memorandum

---

[10] Specifically, the memo states:

> My orders from Mr. Dennis, is that he will make the decisions concerning the Custodial Department . . . One of my issues are when the decisions that Mr. Dennis has made does not get the results he wants then he harass and retaliate against me that I am to blame because I did not handle the issue correctly . . . Mr. Dennis raised his voice at me . . . on two occasions Mr. Dennis came to the office and put his hands on his hips and stood over me when I was sitting at my desk . . . Whenever I have tried to get clarification from Mr. Dennis about an issue that I was concerned about Mr. Dennis retaliated and lied about the conversation as he did in his email dated June 24 and November 16 . . . When I got to his office he told me that he did not want us to be able to work together.

(Def.'s Exh. 21 to Pl. Dep.; see also Doc. #23 at 6-7.)

[11] Marbury testifies by deposition that as of June 14, 2005 (the date she filed her charge of discrimination with the EEOC) she was aware of no witnesses to the alleged harassment.  (See Pl. Dep. at 144; see also Def.'s Exh. 12 to Pl. Dep.)  Obviously, then, no witness testimony could have been investigated by Murray at this time.  (See Doc. #23, p. 13, ¶ 7.)  Because paragraph 1 of plaintiff's affidavit stating that "none of the witnesses that I gave to Ms. Murray were interviewed" (doc. #22, Exh. S, ¶ 1) is in direct contradiction to the prior sworn deposition testimony, it is due to be stricken as it relates to any time prior to June 14, 2005.  See Van T. Junkins and Associates v. U.S. Indust., 736 F.2d 656 (11th Cir. 1984) ("An affidavit may . . . be disregarded as a sham 'when a party has given clear answers to unambiguous questions which negate the existence of any genuine issue of material fact . . . [and that party attempts] thereafter [to] create such an issue with an affidavit that merely contradicts, without explanation, previously given clear testimony").  Thus, defendant's motion (doc. #28) to strike, as it relates to paragraph 1 of plaintiff's affidavit, is **GRANTED** for the time period prior to June 14, 2005.

dated March 24, 2005.[12]  (See Def.'s Exh. 23 to Pl. Dep.)

> With regard to being harassed, your [Marbury] responses indicated that you were <u>not</u> <u>alleging</u> that there was any physical/sexual harassment.  Rather, you explained that Mr. Dennis is verbally demanding, by the tone of voice used and you consider that as harassment.
>
> Also, you mentioned that he has retaliated against you.  With regards to being retaliated against, your responses clearly indicated that there is <u>no</u> <u>documentation</u> of any tangible action (verbal, or written disciplinary actions) instituted against you by Mr. Dennis.
>
> . . .

---

[12] At the same time, Murray sent a memorandum to Dennis outlining the complaints Marbury had lodged against him and summarizing her conclusions.  (See Pl.'s Exh. 17 to Murray Dep.)

> With regards to being harassed, Ms. Marbury indicated that she was <u>not alleging</u> that there was any physical/sexual harassment.  Rather she explained that you are verbally demanding by tone of your voice towards her, and she considers that as harassment.  With regard to the issue of intimidation, I caution you to be aware of your body language towards her or any subordinate.
>
> . . .
>
> With regards to the issue of control, the context of the conversation is where the difference in perspective occurs.
>
> . . .
>
> From the questions and answers given during the investigation, it is evident that communication is the source of the problem between both of you.
>
> . . .
>
> Your roles are clearly defined within the organization.  Line supervisors do not have unilateral decision-making authority.  They have a responsibility to make recommendations as to appropriate action to be taken and to inform their supervisors of issues as the need arises.  The department head is responsible for all decision-making authority and is accountable for those decisions in managing the department.

(Pl.'s Exh. 17 to Murray Dep.)

With regards to the issue of control, the context of the conversation is where the difference in perspective occurs.  Mr. Dennis says that he did ask you to repeat what he says because it was evident to him that there was a communication breakdown.    His   intentions   were   to   minimize misunderstandings by asking you to repeat what he said.  According to Dennis, his intentions were not to belittle or control you . . . his intentions were not to control you or prevent you from doing your job but to be informed and updated by you on a regular basis regarding issues in the department.

. . .

From the questions and answers given during the investigation, it is evident that communication is the source of the problem between both of you.  It is also clear that resolving personnel (BSW) issues is another problem area.  It is apparent that both of you have different perspectives regarding the resolution of custodial issues that have occurred.

. . .

Therefore, communication has to be rebuilt and it is recommended that a professional mediator work with both of you to re-establish the foundation needed for positive dialogue.  The expectation is for both of you to learn how to communicate effectively with one another and resolve conflicts effectively.

(Def.'s Exh. 23 to Pl. Dep.)

Marbury disagreed with Murray's conclusions, particularly with the conclusion that the issues were, in sum, "a mere communication problem." (Def.'s Exh. 26 to Pl. Dep.)  On March 31, 2005, Marbury asked Murray to review her findings and make "needed corrections." (Id.)  "Additionally, I would like to request that the mediator that you spoke with me about be put on hold because, there is no way communication can be effective when the harasser is still being given the opportunity to harass again." (Id.)  Marbury made no new allegations of harassment at this time.  (See

14

generally Def.'s Exh. 26 to Pl. Dep.)

The BAA did, however, follow up with the idea that a communication problem needed to be fixed, and set up a four-day seminar titled "Crucial Conversation Skills." (See Def.'s Exh. 24 to Pl. Dep.)  Although plaintiff missed the first day because of vehicle trouble, she attended the latter three days of the seminar, and admits that those classes were valuable.  (See Pl. Dep. at 253.)  Dennis attended all four days of the seminar.  (See Def.'s Exh. 24 to Pl. Dep.)

Despite the successful communications seminar, Marbury continued to feel that she was being harassed.  On June 22, 2005, she filed another complaint regarding Dennis.  (See Pl. Exh. 2 to Pl. Dep.)

> Tuesday 6-21, around 1:35 p.m. I received a call from Mr. Dennis.  Mr. Dennis told me that he had just received my memo dated 6-21, concerning my shift change.  Mr. Dennis started screaming and yelling.  He told me that my letter was erroneous . . . I was very frightened so I hung up the phone.  In my memo dated 12-6-04, I reported gender harassment, retaliation, and discrimination to Human Resources.  My complaint for relief was not answered.  In my memo date 3-31-05, I asked for relief from gender harassment, retaliation, and discrimination.  Again, my complaint for relief was not answered.  The hostile environment that Mr. Dennis continues to create makes it impossible for me to feel comfortable in his presence or to hear his voice.  I am asking you the leader of the organization to put an end to the violations I have listed above.

(Id.)

On June 23, 2005, Mary Mindingall responded by letter to plaintiff's complaints, setting forth specific responses to plaintiff's issues concerning work

hours, work scheduling, employee behavior, and the BAA's investigation into Marbury's previous complaints.[13]  That letter concluded:

> Ms. Murray investigated your allegations, speaking to both you and Mr. Dennis.  After several meetings, it was determined that the major problem between you and Mr. Dennis was faulty communication.  In response to this and other issues at the Authority, we decided that communication training might assist our employees to work more effectively.  Subsequently, we hired Sharon LoVoy to conduct Crucial Conversation Training.
>
> The Authority wants to ensure that all employees have an opportunity to become valuable assets and committed team members.  The training and intervention is intended to assist employees identify good choices and learn tools to assist them in communicating more effectively.

(Def.'s Exh. 34 to Pl. Dep.)

Despite this response, plaintiff lodged another complaint of harassment on September 13, 2005.

> Mrs. Mindingall I would like to inform you that Sexual Harassment occurred on September 9, 2005 in the office of Acting Director Julius Dennis.  Mr. Dennis told a female Building Service Worker Ms. Ina Hawkins to give me a hug.  Ms. Hawkins paused and told Mr. Dennis, if I would accept her hugging me.  Mr. Dennis arbitrarily told Ms. Hawkins that I would accept her hugging me.  I was standing looking at Mr. Dennis in disbelief.  I do not think that it was appropriate and/or professional for Mr. Dennis to even suggest an act of this nature.  Mr. Dennis telling Ms. Hawkins to hug me was unwelcome on my part and I feel like I have been violated and subjected to sexual harassment. Please address this matter.

---

[13] Plaintiff's deposition testimony reveals that she did not present any witnesses at this point. However, her subsequently filed affidavit broadly states that "none of the witnesses that I gave to Ms. Murray were interviewed."  (Doc. #22, Exh. S, ¶ 1.)  Thus, as noted in footnote 11, supra, defendant's motion (doc. #28) to strike, as it relates to paragraph 1 of plaintiff's affidavit for this complaint is **GRANTED**.

(Def.'s Exh. 27 to Pl. Dep.)

Murray investigated the complaint[14] and found that the subordinate hugged plaintiff "after Mr. Dennis suggested that a hug might be an appropriate conclusion to the meeting." (Def.'s Exh. 28 to Pl. Dep.)  Although Murray determined that the gesture did not violate the company's anti-harassment policy, she did note that "since you [Marbury] have made it clear that you are uncomfortable with hugs in the workplace, management will be sure that Mr. Dennis does not suggest this gesture in the future."   (Id.)   Plaintiff responded in opposition to Murray's findings, emphasizing that the hug was another episode of harassment.  (See Doc. #23, p. 3, ¶ 7.)  "The conclusion to this investigation is a cover up to hide what Mr. Dennis has been doing to me since my original complaint filed 12-04.  Harassment and retaliation is ongoing because management is supporting Mr. Dennis action."  (Pl. Exh. 12 to Murray Dep.)

In sum, plaintiff believes that the complained-of acts constitute gender harassment because she herself has not witnessed Dennis be abusive in a like manner toward men who report to him.[15]  She also believes that she the acts as described

---

[14]  Plaintiff's deposition testimony reveals that she did not present any witnesses at this point. However, her subsequently filed affidavit broadly states that "none of the witnesses that I gave to Ms. Murray were interviewed."  (Doc. #22, Exh. S, ¶ 1.)  Thus, as noted in footnote 11, supra, defendant's motion (doc. #28) to strike, as it relates to paragraph 1 of plaintiff's affidavit for this complaint is **GRANTED**.

[15]  Plaintiff testified:

> Q:  Do you know whether he yelled and screamed at other employees?
>
> A:  I have never – I've never heard him do it.  I've never heard him, never.
>
> Q:  Have you observed meetings between him and his other – other people who reported to him?
>
> A:  I have not.
>
> Q:  So, you don't know how he interacts with the other people under his supervision?
>
> A:  I have been over in the maintenance area on a couple of occasions where I've seen the interaction with Curtis James, and I've never heard him yelling and screaming at him.
>
> Q:  That's not your work area, correct?
>
> A:  It is not.
>
> Q:  So, you're talking a few occasions when you've been over there, for random reasons?
>
> A:  Correct.
>
> Q:  All right.  My question was, you don't know how he interacts with other people that report to him; is that correct?
>
> A:  Correct.

(Pl. Dep. at 217-18.)

Plaintiff also testified, by affidavit contained within her evidentiary submission, that:

> I saw Mr. Dennis interact with other men and he never talked to them the way he talked to me.  He never asked them to cook.  He never screamed or yelled at them.  I saw him giving orders to Mr. Curtis James, a lead worker, and he never made him repeat the orders the way he made me repeat them, which made me feel belittled.

(Doc. #22, Exh. S, ¶ 2.)

Defendant filed a motion (doc. #28) to strike this portion of plaintiff's affidavit on the grounds that it contradicts her prior sworn deposition testimony and is made without any personal knowledge as to how Dennis interacted with other individuals, male or female, that reported to him.  (See Doc. #28 at ¶¶ 5-6.)  The court agrees that as written, paragraph 2 of the affidavit contradicts prior sworn testimony and is made without personal knowledge.  See generally footnote 11, supra.  As such, the relevant portion of the motion (doc. #28) to strike is **GRANTED**.

The court makes two general observations related to the motion (doc. #28) to strike.  First, plaintiff's response (doc. #32) seems to abrogate the contradiction between the deposition and affidavit testimony by stating "Plaintiff has not seen how he [Dennis] interacts with other men that report to him." (Doc. #32 at ¶ 5.)  Second, even had the court denied the motion to strike as it related to paragraph 2 of the affidavit, such a ruling would have been of no consequence.  Regardless of whether or not *plaintiff*

above constitute outrage and invasion of privacy.  (See Compl. ¶ 5.)

## 2.    Plaintiff's Complaints of Retaliation

Plaintiff's EEOC charge describes three specific incidents of alleged retaliation.  "Beginning in February of 2005, and on an ongoing basis since that time, duties formerly associated with my position have been taken from under my authority. On June 2, 2005, I received a lower evaluation than I had ever received during the term of my employment.  On or about June 7, 2005, my flexibility in reporting for work was taken from me."  (Def.'s Exh. 12 to Pl. Dep.)

In support of her claim, Marbury states that on or about June 7, 2005, her "flexibility" in reporting to work was "taken" from her.  (See Pl. Dep. at 291.) Plaintiff has worked the 5:00 a.m. to 2:00 p.m. shift for several years.  (See id. at 292, 296.) However, after Marbury missed a crucial communications meeting, Dennis told Marbury that he thought it would be helpful if she worked the same shift as human resources, 8:00 a.m. to 5:00 p.m.  (See id. at 292-94, 299-300.)  He suggested that Marbury maintain these hours as a regular work schedule.  Marbury disagreed and instead established her regular work schedule as 6:00 a.m. to 2:00 p.m.  (See id. at 295-96.)  "[The 6:00 a.m. to 2:00 p.m. shift] was not necessarily because it worked better for me.  What I was trying to do, as I've always done, is be available for all

---

observed Dennis yell and scream at men, the uncontroverted evidence is that men *did in fact* complain to management about Dennis's "abrasive or dictatorial management style."  (Murray Decl. at ¶ 10.)

three shifts.  This time makes me – I be there for the first shift, I be there pretty much for the second shift, if anything goes on.  I also meet the third shift in the morning. So these hours would be the proper hours for me to actually work."  (Id. at 296.) Despite her stated schedule, Marbury is still able to work different shifts from time to time as needed.  (See id. at 297.)

Next, Marbury alleges that she received a retaliatory evaluation.  On her review for 2004 dated June 2, 2005,[16] plaintiff received an overall score of 88.  (See Def.'s Exh. 29 to Pl. Dep. at BAA/Marbury 00027.)  The score was calculated based on several "optimal performance" marks and one negative statement that plaintiff needed to take appropriate disciplinary action on lead workers where required.  (See Pl. Dep. at 277-78.)  Plaintiff appealed the evaluation and eventually received a higher rating. (See id. at 284-85.)  Nevertheless, the original rating was sufficient to raise plaintiff's compensation to the maximum she was eligible to receive in her salary range – $41,558.  (See Pl. Dep. at 108-10, 276; see also Murray Dep. at 66.)

Finally, as to her job duties claim, Marbury complained on December 20, 2005 to Murray that job duties were being taken away from her.  "Dennis knew that I was the supervisor when [he] gave that part of my job duties to Toni Blast."  (Pl.'s Exh. 13 to Murray Dep.)  Specifically, Marbury lost the functions of ordering supplies for

---

[16] The evaluation should have been completed around November 2004, but was delayed.  (See Doc. #23, p. 14, ¶ 7.)

custodial equipment, attending some management meetings, and scheduling and interviewing workers for temporary assignments.  (See Pl. Dep. at 275.)  However, these changes did not result in any loss of pay to plaintiff.  (See Pl. Dep. at 265, 267.)

## IV.    ANALYSIS

### A.    Title VII Gender Harassment Claim

#### 1.    The basics of Title VII gender harassment.

Plaintiff asserts a claim for gender harassment in violation of Title VII, as that environment was allegedly created by the actions of Julius Dennis.  Title VII provides that an employer "shall not discriminate against any individual with respect to his terms, conditions, or privileges of employment, because of such individual's race, color, religion, *sex*, or national origin . . ."  42 U.S.C. § 2000e-2(a)(1) (1994) (emphasis added).  Title VII has been interpreted to specifically allow claims for gender harassment to rest upon the theory of an abusive work environment.[17]  See, e.g., Burlington Indust. v. Ellerth, 524 U.S. 742, 765 (1998).  A plaintiff attempting to show that she has been subjected to an abusive work environment by a supervisor

---

[17] The Ellerth and Faragher decisions indicate that courts should no longer use the hostile work environment label in analyzing whether an employer should be held liable on a Title VII claim in which no tangible adverse employment decision has been made.  In analyzing claims that heretofore would have been labeled "hostile work environment" claims, courts should ask only whether the conduct complained of "is sufficient to constructively alter an employee's working conditions."  Frederick v. Sprint/United Management Co., 246 F.3d 1305, 1311 (11th Cir. 2001).

must prove a number of elements to establish the claim.  These elements include proof that: (1) the employee belongs to a protected group; (2) the employee has been subject to unwelcome harassment; (3) the harassment was based on the sex of the employee; (4) the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive work environment; and (5) a basis for holding the employer liable.  See Mendoza v. Borden, Inc., 195 F.3d 1238, 1245 (11th Cir. 1999) (en banc).  "Regarding this fifth factor, the Supreme Court held recently that in claims based on a supervisor's harassment, an employer may be vicariously liable for actionable hostile environment discrimination caused by a supervisor with immediate (or successively higher) authority over the employee – subject to an affirmative defense." Mendoza, 195 F.3d at 1245 n.4, citing Faragher v. City of Boca Raton, 524 U.S. 775 (1998); see also Burlington Indust., Inc. v. Ellerth, 524 U.S. 742 (1998).

A prima facie showing of a hostile work environment arises only where the harassment is so "severe or pervasive" as to "alter the conditions of employment and create an abusive working environment." Faragher, 524 U.S. at 786, citing Meritor Sav. Bank v. Vinson, 477 U.S. 57, 67 (1986).  The courts' interpretations of the general standard announced in Meritor "are sufficiently demanding to ensure that Title VII does not become a 'general civility code.'" Faragher, 524 U.S. at 788, citing

Oncale v. Sundowner Offshore Serv., Inc., 523 U.S. 75, 80 (1998). For example, offhand comments, isolated incidents (unless extremely serious), and other similar tribulations of the workplace will not amount to changes altering the terms and conditions of employment. See id. Furthermore, in order to be actionable under the statute, the work environment must be offensive on both an objective and a subjective level. That is, the environment must be "one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so." Id. at 787. This is a question to be determined with regard to the totality of the circumstances. See Henson, 682 F.2d at 904. Additional factors for courts to consider in the totality analysis include: the frequency of the discriminatory conduct, the severity of the conduct, whether the conduct is physically threatening or humiliating or a mere offensive utterance, and whether the conduct unreasonably interferes with an employee's work performance. See Harris v. Forklift Sys., Inc., 510 U.S. 17, 22 (1993).

An employer is subject to vicarious liability for the actionable hostile environment created by the victim's supervisor, where that supervisor has the authority to affect the terms and conditions of the plaintiff's employment. See Faragher, 524 U.S. at 807. Where no adverse employment decision has been made or has resulted, the Faragher court allows the employer an affirmative defense. See

id.; see also Pennsylvania State Police v. Suders, 542 U.S. 129, 148 (2004). The affirmative defense requires the defendant to prove "that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior." Faragher, 524 U.S. at 807. The defendant must also prove that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise, *or* the defendant must show that it responded by taking reasonable corrective action after the plaintiff took advantage of the preventive or corrective opportunities provided by defendant. See id.

**2.  Plaintiff has not established a prima facie case of harassment.**

Plaintiff argues in brief that the harassment was based upon her gender because: "he didn't treat the men that way, and even if he did, it had a different effect on women." (Doc. #23 at 16-17.) No further explanation is provided by plaintiff's brief. (See id.)

A review of plaintiff's allegations reveals that only two offhand comments could even marginally be construed as gender discriminatory. Dennis's statement that "men are pretty much over everything" and his asking Marbury to cook for him could possibly be based on gender, but without more, they fall far short of establishing that Marbury was harassed *because of* her gender. The remainder of the allegations

24

constituting Marbury's claims for gender harassment *are not even marginally* gender-based.[18]   Equally instructive on the determination that Marbury was not harassed *because of* her gender are her own admissions that: (1) she has no knowledge regarding Dennis's interactions with his male subordinates; (2) she is unaware of <u>anyone</u> who liked Dennis's management style; and (3) she believed that two males resigned or accepted lower paying positions because of Dennis's abrasive management style.[19]   (<u>See</u> Pl. Dep. at 121-22, 153-54, 217-18, 362.)

Simply, the evidence shows that Dennis was a difficult manager who used abrasive and dictatorial techniques with his subordinates, male and female alike. While such behavior is unprofessional, it is not the kind of behavior which Title VII was designed to guard against.[20]

Even had Marbury demonstrated the gender prong of her prima facie case, she could not (and does not) establish the severe or pervasive prong.  A working environment is not actionable unless it is objectionable both on an objective and subjective level and is extreme such that it amounts to a change in the terms and

---

[18] <u>See</u> discussion <u>supra</u>, Section III.B.

[19] In fact, it is undisputed that around March 2005, Leslie Murray received complaints from three of Dennis's <u>male</u> subordinates that Dennis exhibited an abrasive and dictatorial management style.  (<u>See</u> Murray Decl. at ¶ 10.)

[20] Plaintiff attempts to get around the fact that Dennis treated men and women alike by stating that the behavior affected the women more than it did the men.  (<u>See</u> Doc. #23 at 16-17.)  However, she presents no evidence in support of this contention.

conditions of employment.  See Faragher, 524 U.S. at 786.  Although plaintiff cites

to a myriad of cases as evidence that the conduct as alleged rises to the level protected

by Title VII, such reliance is misplaced.  The cases cited contain allegations of

conduct much more outrageous and gender specific than that alleged by Marbury.[21]

And despite the fact that Marbury has the frequency of the yelling and screaming on

her side,[22] none of the other "harassing" conduct was frequent, severe, or anything

_____

[21] For example, in Cross v. Alabama, 49 F.3d 1490 (11th Cir. 1995), the plaintiffs therein alleged that the harasser: stated that particularly female employees must prove to him that they were not incompetent and they were not inadequate; made passes at females, including hugs, winks, stares; frequently yelled, screaming, pounded on the desk, name called, finger pointed, and got with eighteen inches of plaintiff's face; was recognized by management to be tougher on women than men; made the comment that "women belonged barefoot and pregnant;" threw a lit cigarette at a female employee; tried to belittle women; told sexual and dirty jokes; labeled women as "rather dumb," "stupid," and "just a woman;" made female secretaries cry; scared the women into thinking that he might strike them at any time; encouraged men to speak over women; made comments that mistakes would not be made if men were in the positions of decision-making; used the good old boy technique when dealing with the men; called a female employee a "butt head" and a "cow;" talked down to women; caused female employees coming out of the alleged harasser's office in tears; had underlying anger toward women because of his previous marriages; et al.

In Lewis v. Federal Prison Indust., Inc., 786 F.2d 1537 (11th Cir. 1986) (an age discrimination case), the plaintiff alleged that the harasser: made the plaintiff follow the letter of the handbook, knowing that plaintiff had been under a doctor's care for stress; engaged in direct verbal abuse; upbraided plaintiff in the presence of inmates; watched plaintiff closely to catch him in a mistake; advised other employees not to have anything to do with plaintiff; repeatedly told plaintiff he should "go ahead and retire;" told plaintiff that if he was to remain an employee, he was not allowed to sit; removed plaintiff's desk chair and moved plaintiff to an open area where he could be observed at all times; told plaintiff he should retire before the next rating period; et al.

In Huddleston v. Roger Dean Chevrolet, Inc., 845 F.2d 900 (11th Cir. 1988), the plaintiff alleged gender discrimination because: the men at the dealership prevented her from meeting customers, i.e. "boxed her out;" she was asked if she thought the men she worked with were good looking; made derogatory comments to her, such as calling her a "bitch" and a "whore;" they let out gas during her sales presentations; they teased her about being a "bald-headed woman with a wig;" being told that the men were going to take off her pants and put a skirt on her; and was yelled at almost continuously.

[22] Plaintiff argues that her case can be categorized with the above-mentioned cases because "it was constant bulling and the plaintiff was begging HR to do something about this man, that he was ruining her job and her life . . ." (Doc. #23 at 19.)

more than an utterance that was offensive to plaintiff.  Marbury has not presented evidence that the conduct amounted to anything more than the tribulations of dealing with a demanding boss.  And even constant scrutiny in combination with offhand comments is not sufficient for a finding that plaintiff's working conditions were altered or that plaintiff was subject to severe conduct.  See Hill v. IGA Food Depot, 2006 WL 3147672, No. 2:04-cv-00966, at *4 (M.D. Ala. Nov. 2, 2006), citing Dudley v. Wal-Mart Stores, Inc., 931 F.Supp. 773, 816 (M.D. Ala. 1996), abrogated on other grounds by Moore v. State of Alabama, 989 F.Supp. 1412 (M.D. Ala. 1997) (Plaintiff's claim that her supervisor "scrutinized her work and pointed out her shortcomings on a regular basis . . . does not approximate the severity required to state a claim for a hostile work environment).

Thus, defendant's motion for summary judgment as it relates to plaintiff's claim for a gender related hostile work environment is due to be granted.[23]

## B.    Title VII Retaliation

Retaliation is a separate claim under Title VII, and to recover under such a claim, a plaintiff "'need not prove the underlying claim of discrimination which led to her protest,' so long as she had a reasonable good faith that the discrimination

---

[23] The affirmative defense is inapplicable in this case because the BAA was not obligated under Title VII to take any corrective action in response to the gender-neutral complaints alleged as harassment. That the yelling and screaming continued, despite the communications training is not, as plaintiff states, proof "that this defendant does not take sex harassment complaints seriously."  (Doc. #23 at 22.)

existed." Gupta v. Florida Bd. of Regents, 212 F.3d 571, 586 (11th Cir. 2000), citing

Meeks v. Computer Assocs. Int'l., 15 F.3d 1013, 1021 (11th Cir. 1994). Thus even

where a plaintiff has failed to make a prima facie showing of discrimination (or

present sufficient evidence of discriminatory treatment), she may still have a valid

claim for retaliation.

In order to establish a prima facie case of retaliation, a plaintiff must prove the

following elements: (1) she participated in an activity protected by Title VII; (2) she

suffered an adverse employment action; and (3) there is a causal connection between

the participation in the protected activity and the adverse employment decision. See

Farley v. Nationwide Mut. Ins., 197 F.3d 1322, 1336 (11th Cir. 1999). A causal

connection is established when the plaintiff shows that the decision-maker was aware

of the protected conduct and that the protected activity and the adverse action were

not wholly unrelated. See id. at 1377. Thus, a "close temporal proximity" between

the plaintiff's protected conduct and an adverse employment action generally is

sufficient circumstantial evidence of a causal connection for purposes of a prima facie

case. See id. On the other hand, the Eleventh Circuit has indicated that a substantial

delay between the protected activity and the adverse employment action and the

absence of other evidence tending to show causation may justify judgment as a matter

of law for the employer. See Wascura v. City of South Miami, 257 F.3d 1238, 1248

(11th Cir. 2001); see also Maniccia v. Brown, 171 F.3d 1364, 1370 (11th Cir. 1999).

Once the plaintiff has made a prima facie case of retaliation, the defendant must come forward with a legitimate, non-discriminatory reason for the adverse employment decision. See St. Mary's Honor Cntr v. Hicks, 509 U.S. 502, 507 (1993). Because a plaintiff bears the burden of proving pretext, once defendant has articulated a legitimate, non-discriminatory reason for the termination, plaintiff must present significantly probative evidence proving pretext to avoid summary judgment. See Celotex, 477 U.S. at 317. That is, the plaintiff must establish evidence from which a reasonable trier of fact would disbelieve rather than disagree with defendant's articulated legitimate, non-discriminatory reason for the adverse employment action. See Combs v. Plantation Patterns, 106 F.3d 1519, 1543 (11th Cir. 1997).

There is no dispute that plaintiff complained about conduct which she considered to be harassment beginning as early as November 2004, and continuing until September 2005. (See Def.'s Exhs. 19, 20, 26, 27 to Pl. Dep.; see also Pl. Exh. 2 to Pl. Dep.) The court assumes, without deciding, that this satisfies the first prong of plaintiff's prima facie case. However, plaintiff still must overcome the adversity and temporal proximity hurdles before satisfying her prima facie burden.

In light of Burlington Northern & Santa Fe Railway Co. v. White, 126 S.Ct. 2405, 2409 (2006), the adversity inquiry before this court centers on whether the acts

as alleged would have been materially adverse to a reasonable employee; that is, the court must consider whether the alleged actions were harmful to the point that they could well dissuade a reasonable worker from making or supporting a charge of discrimination.  Courts must examine the record for "objective serious and tangible actions" and be cognizant of the fact that "Title VII is neither a 'general civility code' nor a statute making actionable the 'ordinary tribulations of the workplace.'" Burlington, 126 S.Ct. at 2415 ("We speak of *material* adversity because we believe it is important to separate significant from trivial harms.  Title VII, we have said, does not set forth 'a general civility code for the American workplace").  Here, the acts complained of by Marbury had no adverse effect on her inclinations to lodge complaints of discrimination.  (See generally Def.'s Exhs. 12, 19, 21, 26, 27 to Pl. Dep.; see also Pl. Exh. 2 to Pl. Dep. and Pl.'s Exhs. 12, 13 to Murray Dep.) Moreover, no reasonable employee could be dissuaded to make charges of discrimination based upon: (1) the BAA's request that plaintiff commit to a work schedule of her choice (which nevertheless allowed her to maintain flexibility when needed); (2) the BAA's failure to require plaintiff to complete purchase order forms for new equipment (although plaintiff nevertheless can and does report the need for new custodial equipment); (3) the BAA's reassigning of plaintiff's job duty to schedule temporary help interviews (although plaintiff participates in the interviews

and the assessment of hiring the temporary employee); and (4) a performance review that contained only one arguably negative remark (and that resulted in the highest wage she could receive within her salary range).  (See Doc. #23 at 13-15.)[24]  Simply, although these changes made Marbury unhappy, a finding that they met the adversity threshold would turn Title VII into a general civility code.  This court is not willing to do that.

Even had plaintiff overcome the adversity threshold, she nevertheless would have been unable to demonstrate a sufficient nexus between her protected activity and the adverse actions she allegedly suffered.  Plaintiff's first formal complaint was made in December 2004.[25]  The alleged retaliatory conduct did not occur until May, June, and December 2005.  (See Doc. #23 at 13-15, ¶¶ 3, 5, 6, 8, 9, 10, 11, 14, 15.)  This substantial delay between the protected activity and the "adverse" employment actions, coupled with the absence of any other evidence tending to show causation, leads to the conclusion that plaintiff has failed to establish this prong of her prima

---

[24] Although the factual section of plaintiff's brief related to retaliation contains 15 separately numbered paragraphs, several of those paragraphs are duplicative.  (See Doc. #23 at 13-15.)  In actuality, plaintiff's retaliation claim only encompasses the above-outlined complaints of retaliation.  The additional allegations made in brief were not made in plaintiff's EEOC charge or complaint.  See Backer v. Buckete Cellulose Corp., 856 F.2d 455, 466 (11th Cir. 1998).

[25] Although plaintiff seems to suggest in her brief that a new complaint was lodged by memo dated March 31, 2005 (see doc. #23 at 6-8, ¶¶ 14, 17), that memo does nothing more than disagree with the BAA's findings on the investigation of the December 2004 complaint; it lodges no new discrimination complaint.  (See Def.'s Exh. 26 to Pl. Dep.)  Moreover, although plaintiff states that she made a total of eight complaints to management or HR (see doc. #23, p. 6, ¶ 14), she explains only three of those alleged complaints in brief.  (See id. at pp. 10-11, ¶¶ 1-4.)

facie case. <u>See</u> <u>Wascura</u>, 257 F.3d at 1248 ("The three and one-half month time period between [plaintiff's] notification to the [defendant] of her son's illness and her subsequent termination does not, standing alone, show that the [defendant's] articulated reasons for her termination were pretextual"); <u>see also</u> <u>Minhngoc P. Tran v. Boeing Co.</u>, 2006 WL 2167329, No. 05-13076, at *5 (11th Cir. 2006) (holding that a gap of four months between employee complaining about supervisor's discrimination and the employee's selection for layoff was too long, by itself, to establish retaliation).

Because Marbury has failed to establish a prima facie case of gender retaliation under Title VII, summary judgment is due to be granted as to this claim.[26]

## C.    Title VII Disparate Terms and Conditions Because of Sex

Marbury contends that she was treated differently than similarly situated males in violation of Title VII.   The claim, based loosely on loss of duties, lowered evaluation, and loss of flexibility, is purportedly supported by two Supreme Court decisions.[27]   (<u>See</u> Doc. #21 at 41; Doc. #23 at 24-25; <u>see</u> <u>also</u> <u>Davis v. Town of Lake</u>

---

[26] Even had plaintiff established the prima facie case, her retaliation claim would have nevertheless failed because she has presented no evidence that the articulated legitimate, non-discriminatory reasons were pretextual.  <u>See</u> <u>Rainey v. Vinson Car Service</u>, 120 F.3d 1192, 1196 (11th Cir. 1997) (If employer offers legitimate reasons, the presumption of retaliation disappears) and <u>generally</u> Doc. #21 at 39-40. Instead, her brief focuses only on the prima facie case and makes no attempt whatsoever to rebut defendant's articulated legitimate, non-discriminatory reasons for the actions taken.  (<u>See</u> Doc. #23 at 22-24.)

[27] <u>Desert Palace v. Costa</u>, 539 U.S. 90 (2003) and <u>Meritor Savings Bank, FSB v. Vinson</u>, 477 U.S. 64 (1986).

Park, Florida, 245 F.3d 1232 (11th Cir. 2001)).  However, in contrast to the cases cited, the evidence in this case establishes that the changes to plaintiff's terms and conditions of employment fall into the category of trivial harms.[28]  Moreover, plaintiff has presented *no* evidence to establish that the changes were made for the purpose of discriminating against her because of her gender.  (See Doc. #23 at 24-25; see also generally Pl. Dep.)

Accordingly, summary judgment is due to be granted on plaintiff's gender disparate  treatment claim.

## D.    The BAA's Liability on the State Law Claims[29] for Invasion of Privacy and Outrage

The BAA is liable for the intentional torts of Dennis if: (1) the employee's acts are committed in furtherance of the business of the employer; (2) the employee's acts are within the line and scope of his employment; or (3) the employer participated in, authorized, or ratified the conduct.  See Potts v. BE&K Constr. Co., 604 So.2d 398, 400 (Ala. 1992).  Since there is no allegation that the conduct of Dennis was done in furtherance of Legacy's business or in the line and scope of employment, the BAA is liable for the conduct of Dennis only if it participated in, authorized, or ratified

---

[28] See discussion supra on retaliation, Section IV.B.

[29] In the instant action, plaintiff did not bring any state law tort claims against the alleged harasser himself.  Instead, she seeks to hold the BAA wholly responsible for the actions of an individual.

Dennis's conduct.  Thus, liability attaches only if: (1) the BAA had actual knowledge of the tortious conduct of Dennis; (2) based on this knowledge, the BAA knew the conduct constituted a tort; and (3) the BAA failed to take adequate steps to remedy the situation.  See id.  "Adequate" steps are those which are reasonable and necessary to stop the tortious conduct.  Id. at 401.  The Alabama Supreme Court has held that where an employer takes inadequate corrective action by failing to investigate or reprimand the co-employee, that employer may be liable for the intentional torts of an employee.  See Mardis v. Robbins Tire & Rubber Co., 669 So.2d 885, 889 (Ala. 1995).  In contrast, where the specific tortious conduct stops after corrective action by the employer, the Alabama Supreme Court has held that the corrective action is adequate as a matter of law.  See Potts, 604 So.2d at 401.

### 1.    Invasion of Privacy

An individual's privacy right is invaded when that individual's private activities have been wrongfully intruded upon such that the intrusion causes outrage or mental suffering, shame, or humiliation to a person of ordinary sensibilities.  See Busby v. Truswal Sys. Corp., 551 So.2d 322, 323 (Ala. 1989), citing Coates v. Taylor, 428 So.2d 637, 639 (Ala. 1983).  The "wrongful intrusion" prong is defined as "intentional interference with another's interest in solitude or seclusion, either as to his person or to his private affairs or concerns."  Id.  The fact that a defendant does

34

not make coercive demands or improper inquiries into sexual proclivities or personality does not automatically justify a grant of summary judgment in favor of the defendant.  See Cunningham v. Dabbs, 703 So.2d 979, 982 (Ala. 1997).  Rather, inappropriate contact and innuendo may lead to a determination of intrusion into personal affairs.  See id.

_____The question for this court to consider on Marbury's invasion of privacy claim is whether there was an offensive or objectionable prying or intrusion into her personal affairs or concerns that would have been objectionable to a reasonable person.  Disputed evidence was presented by Marbury purporting to show that Dennis invaded her privacy by: (1) standing with his stomach within eighteen inches of her face; (2) asking her whether she was having an affair with a co-worker; (3) asking her to cook for him; (4) forcing her to accept a hug from a female co-worker at the conclusion of a meeting; and (5) yelling and screaming at her on a constant basis.[30] Taking all of these disputed facts as true, the court nevertheless finds that no reasonable jury could conclude that Dennis intruded into Marbury's private affairs in an offensive or objectionable manner, nor that Dennis invaded Marbury's right to privacy.  At the outset, yelling and screaming in the workplace carries with it no sexual overtones or sexual innuendo, especially since Dennis yelled and screamed at

---

[30] Plaintiff's brief fails to explain the specific conduct alleged to be an invasion of privacy, instead broadly stating, "Plaintiff alleges each fact and argument the same as set forth herein."  (Doc. #23 at 25.)

both men and women alike.  Furthermore, the record contains scant evidence that Dennis engaged in the alleged behaviors to intentionally intrude on the personal affairs of Marbury.  Simply stated, these incidents, without more, fall short of the conduct that the Alabama Supreme Court held did not rise to the level of an invasion of privacy.  See McIssac v. WZEW-FM Corp., 495 So.2d 649, 652 (Ala. 1986) (holding that the following conduct considered in totality "fall[s] short of that required to constitute this tort:" asking the employee to have an affair, asking the employee out to dinner, asking employee to travel with employer out of state, and putting his arm around her); see also Phillips v. Smalley Maintenance Servs., Inc., 435 So.2d 705 (Ala. 1983).

Accordingly, the court finds that defendant's motion for summary judgment as it relates to plaintiff's state law claim for invasion of privacy is due to be granted.[31]

## 2.  Outrage

Marbury's burden as it relates to her claim for outrage is a heavy one.  See Ex parte Crawford & Co., 693 So.2d 458, 459 (Ala. 1997).  In order to create a jury question on the tort of outrage, there must exist "sufficient evidence from which permissible inferences could be drawn to support a finding of extreme conduct

---

[31] Moreover, the BAA cannot be held liable for the acts of Dennis because, although the company had knowledge of the alleged wrongs, the conduct as alleged would not have put the BAA on actual notice of alleged tortious conduct.  The BAA would have no reason to think, much less know, that the conduct as alleged might constitute a tort.  See Potts, 604 So.2d at 400-01.

necessary to constitute outrageous conduct." Id., citing Empiregas Inc. Of Gadsden v. Geary, 431 So.2d 1258, 1261 (Ala. 1983). That is, Marbury must present evidence that the BAA intentionally or recklessly engaged in conduct that was "so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in civilized society." American Road Serv. Co. v. Inmon, 394 So.2d 361, 365 (Ala. 1980). Traditionally, Alabama courts apply the Inmon test strictly, thereby allowing an outrage claim to go to the jury only in egregious cases. See Tinker v. Perry Beasley, 429 F.3d 1324 (11th Cir. 2005), quoting Inmon, 394 So.2d at 365; see also Soti v. Lowe's Home Centers, Inc., 906 So.2d 916 (Ala. 2005). In fact, the Alabama Supreme Court has outlined three limited circumstances where courts have allowed claims for outrage to proceed: (1) cases having to do with wrongful conduct in the context of family burials; (2) a case in which insurance agents employed heavy-handed, barbaric means in attempting to coerce individuals into settling insurance claims; and (3) a case involving egregious sexual harassment. See Thomas v. BSE Contractors, Inc., 624 So.2d 1041, 1044 (Ala. 1993).

Therefore, for many of the same reasons that plaintiff's invasion of privacy claim failed, her claim for outrage also fails. Plaintiff's allegations fall more in line with verbal harassment than anything else. (See Pl. Dep. at 142-44.) This is not

enough to support an outrage claim.  The conduct as alleged is clearly not beyond all possible bounds of decency and certainly is not "utterly intolerable in a civilized society."[32]  <u>Inmon</u>, 394 So.2d at 365.

Therefore, defendant's motion for summary judgment as it relates to plaintiff's state law claim for outrage is due to be granted.[33]


## V.      Conclusion

In summary, the court finds that no material issues of fact remain and that defendant Birmingham Airport Authority is entitled to judgment as a matter of law as to all claims asserted by plaintiff.  Further, defendant's motion (doc. #28) to strike portions of plaintiff's affidavit is **GRANTED** to the extent addressed within this

---

[32] Plaintiff cites only two cases in support of her contention that the conduct she alleges supports a claim for outrage, <u>Machen v. Childersburg Bancorporation, Inc.</u>, 761 So.2d 981 (Ala. 1999) and <u>Henry v. Georgia-Pacific Corp.</u>, 730 So.2d 119 (Ala. 1998).  The conduct as alleged in those cases was infinitely more intolerable than the conduct as alleged by Marbury and would have put the employer on notice of potentially tortious conduct.  <u>See Machen</u>, 761 So.2d at 982-84 (Plaintiff was subjected to lewd and suggestive comments and touched in an offensive manner.  She informed management that she had been sexually abused as a child and was particularly offended by the harasser's conduct.  Management did not reprimand the alleged harasser.  Although the conduct stopped for awhile, after it resumed plaintiff resigned her employment) and <u>Henry</u>, 730 So.2d at 120 (Plaintiff asked a doctor, hired by the company, to help her quit smoking in private sessions.  The doctor began asking plaintiff about her sexual relationship with her husband, and spoke to her during hypnosis about sex.  Although plaintiff complained about this to company management, she was instructed that she had to continue with the sessions or else lose her job.)

[33] Moreover, the BAA cannot be held liable for the alleged acts of Dennis because, although the company had knowledge of the alleged wrongs, the conduct as alleged would not have put the BAA on actual notice of <u>tortious</u> conduct.  The BAA would have no reason to even think, much less know, that the conduct as alleged might constitute the tort of outrage.  <u>See Potts</u>, 604 So.2d at 400-01.

Memorandum Opinion.

A separate order will be entered.

**DONE** this the ___29th___ day of March, 2007.

_____
SENIOR UNITED STATES DISTRICT JUDGE